UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| JERRY R. LONG, } | |
| } | |
| Plaintiff, } | |
| } | |
| v. } | Case No.:  1:13-cv-01577-MHH |
| } | |
| JOHN MCHUGH, SECRETARY } | |
| OF THE ARMY, } | |
| } | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

After the Anniston Army Depot told the plaintiff, Jerry Long, that it would not renew his term of appointment as a sandblaster, Mr. Long sued the Secretary of the Army.  Mr. Long contends that the Anniston Army Depot violated Title VII of the Civil Rights Act of 1964 because it discriminated against him on the basis of his race.  Pursuant to Federal Rule of Civil Procedure 56, the Secretary has asked the Court to enter judgment in his favor on Mr. Long's Title VII claim.  (Doc. 12).  The Secretary argues that Mr. Long has not provided evidence that establishes a prima facie case of discrimination and, alternatively, that Mr. Long has not provided evidence that supports a reasonable inference of intentional discrimination.  For the reasons stated below, the Court grants the Secretary's motion for summary judgment.

1

## I. SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

When considering a summary judgment motion, the Court "must view the facts in the light most favorable to the nonmoving party" and "must also draw all reasonable inferences in favor of the party opposing summary judgment." *Valderrama v. Rousseau*, 780 F.3d 1108, 1112 (11th Cir. 2015) (internal citations and quotation marks omitted). If the evidence is merely colorable or is not significantly probative, then the Court may grant summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

Under Federal Rule of Civil Procedure 56(c)(2), at the summary judgment stage, "[a] party may object that the material cited to support or dispute a fact

cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). These objections function like trial objections, and "[t]he burden is on the proponent [of the evidence] to show that the material is admissible as presented or to explain the admissible form that is anticipated." Fed. R. Civ. P. 56(c)(2), advisory committee's note (2010 amendments). If the Court finds that summary judgment evidence will be available at trial in an admissible form, then the Court may consider the evidence when deciding a summary judgment motion, even though the evidence is not in an admissible form at the summary judgment stage. For example, "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012) (internal quotation marks omitted). A district court has broad discretion to determine at the summary judgment stage what evidence it will consider pursuant to Rule 56(c)(2). *See Green v. City of Northport*, 2014 WL 1338106, at *1 (N.D. Ala. March 31, 2014).

## II.   FACTUAL AND PROCEDURAL BACKGROUND

At the height of the War on Terror in late 2005, Mr. Long, an African-American, began working in the directorate of production of the Anniston Army Depot as a grade 7 term sandblaster. (Doc. 12-4, pp. 15-16, 18). The Army Depot initially appointed Mr. Long for a term not to exceed thirteen months, with a

provision that the Depot could extend the appointment term for up to four years. (Doc. 12-5). Mr. Long's employment was subject to renewal or nonrenewal. (Doc. 12-4, p. 74).

The Army Depot extended Mr. Long's employment at various intervals in the four years following his appointment. (Docs. 12-6; 12-7). In December 2009, Mr. Long reached the four-year limit on his employment term. The Office of Personnel Management's Schedule A, 5 C.F.R. § 213.3106(b)(10), allowed the Depot to extend Mr. Long's employment beyond the four-year limitation in an effort "to rebuild and create an independent, free and secure Iraq and Afghanistan." (Doc. 12-13). The Army Depot repeatedly extended Mr. Long's term of employment over the next twenty-eight months. (Doc. 12-4, pp. 107-12).[1]

At all relevant times, Mr. Long had the following chain of supervisors at the Anniston Army Depot:  Horace Gibbons (first level); James McKinney (second level); Warren Turner (third level); Thomas Carlisle (fourth level); Jeff Simmons (fifth level). (Docs. 12-4, p. 23; 12-10, p. 4; 12-8, p. 25). Mr. Long was a productive and dependable worker. (Doc. 12-10, pp. 4, 9). He was qualified to be a sandblaster. (Doc. 12-10, p. 4). He received excellent reviews from his supervisor, Mr. Gibbons. (Doc. 18-1, pp. 31-36).

---

[1] During this timeframe, the Army Depot extended Mr. Long's employment in the following manner: 12-12-2005 not to exceed 1-11-2007; 1-10-2007 not to exceed 9-30-2008; 10-1-2008 not to exceed 12-12-2009; 12-12-2009 not to exceed 12-11-2010; 12-12-2010 not to exceed 12-11-2011; 12-12-2011 not to exceed 2-29-2012; 3-1-2012 not to exceed 3-30-2012; 3-31-2012 not to exceed 4-30-2012. (Docs. 12-4, pp. 107-12; 12-5; 12-6; 12-7).

Sometime in early 2012, a few months before Mr. Long's last contract extension was set to expire, the Army Depot performed an institution-wide work load projection analysis to determine the institution's projected workload and the number of employees that needed to support that workload over the course of the next fiscal year. (Doc. 12-8, p. 27; Doc. 12-10, p. 16). The analysis indicated that the Army Depot was overstaffed with term sandblasters. (Doc. 12-8, p. 29).

Following this analysis, Mr. Carlisle and Mr. Simmons decided not to extend the term of employment for Mr. Long and the three other term sandblasters in his cost center: Joey Howard (Caucasian), Woodrow English (African American), and Jaworski Wilson (African American). (Doc. 12-4, pp. 30-31; Doc. 12-8, p. 63). In early April 2012, Mr. McKinney informed Mr. Long and the other three term sandblasters in Mr. Long's cost center that their terms would expire on April 30, 2012. (Doc. 12-8, p. 43). Some of the term sandblasters in Mr. Long's cost center began to shirk their responsibilities, creating a backlog of sandblasting work in Mr. Long's cost center that deviated from the Army Depot's workload projection for the upcoming fiscal year. (Doc. 12-8, p. 47). Mr. Gibbons testified that a funding shortfall also contributed to the backlog in Mr. Long's cost center. (Doc. 12-10, pp. 9-10).

In late April, the Army Depot moved four grade 8 mechanics to Mr. Long's cost center to address the backlog of sandblasting work. (Doc. 12-10, p. 8).[2] These mechanics were Caucasian term employees whose terms were set to expire sometime after the terms of Mr. Long and the other term sandblasters in his cost center were scheduled to expire. (Doc. 12-10, p. 9; Doc. 12-8, p. 47). In April 2012, Mr. Long helped train the four grade 8 mechanics to perform sandblasting duties. (Doc. 12-4, p. 69). After Mr. Long's term of employment expired, the Army Depot replaced Mr. Long with one of the grade 8 mechanics who was Caucasian. (Doc. 12-10, p. 9).

By the end of April 2012, the Army Depot had decided not to renew the terms of 22 term employees in the Depot's directorate of production and a total of 38 of the Depot's term employees. (Doc. 12-16). The employees whose terms of appointment lapsed at the end of April 2012 included both African-Americans and Caucasians. (Doc. 12-4). Between March and June of 2012, the Depot chose not to renew the terms of 133 term employees throughout the Depot. (Doc. 12-16).

When asked to explain why he believed that the Army Depot had discriminated against him, Mr. Long stated:

---

[2] The record suggests that in April 2012, the Depot sent twelve employees to Mr. Long's cost center to address a backlog of work; however, only four of those employees—all of whom were grade 8 mechanics—were tasked with addressing the backlog of sandblasting work. (Doc. 12-10, p. 9). Of those twelve employees, three were African-American and nine were Caucasian. (Doc. 12-10, p. 7).

> Because they lied to me. . . . They lied. They told me that I was getting laid off because lack of work only and we had plenty of work in the building. And they brought in white guys, replaced us to do our job that they said there wasn't any work at the building, which there was work in the building. Not only that, they put them on overtime immediately. After we left they went on overtime.

(Doc. 12-4, p. 69). The overtime issue was significant to Mr. Long because while he worked at the Army Depot, Mr. Gibbons repeatedly asked the Depot to pay overtime to the employees in his cost center. (Doc. 12-10, p. 9). The Army Depot began paying overtime to the employees in Mr. Gibbons's cost center after Mr. Long's term of employment at the Depot expired. (Doc. 12-10, p. 9).

Beyond the workload and overtime issues, Mr. Long recalled an incident at the Army Depot in which an employee named "Big Man" directed a racial slur toward Mr. Long. (Doc. 18-1, p. 30). Also, at some point, Mr. Long heard about a noose hanging in a building at the Depot, and he saw racial slurs written on the bathroom wall. (Doc. 12-4, pp. 60-61; Doc. 18-1, p. 30).

On May 31, 2012, Mr. Long filed a formal EEO complaint in which he alleged that the Army Depot discriminated against him because of his race. (Doc. 12-4, pp. 84-85). On May 23, 2013, the Department of the Army rendered its final agency decision. The Department found no discrimination and issued to Mr. Long a notice of right to sue. (Doc. 12-4, pp. 86-95). Mr. Long filed his lawsuit on August 26, 2013. (Doc. 1).

## III.  MOTION TO STRIKE

Before the Court may decide whether the summary judgment record contains disputed material facts that preclude summary judgment on Mr. Long's Title VII race discrimination claim, the Court must determine the scope of the summary judgment record.  Mr. Long attached a sworn declaration to his response to the Secretary's summary judgment motion.  (Doc. 18-1, pp. 29-30).  The Secretary asks the Court to strike part or all of Mr. Long's sworn declaration.  (Doc. 20).  The Secretary presents a number of arguments in support of his motion.

First, citing the sham affidavit rule, the Secretary argues that the Court should disregard Mr. Long's declaration because material assertions in the affidavit contradict Mr. Long's prior deposition testimony.  (Doc. 20).  The sham affidavit rule provides that "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."  *Van T. Junkins & Associates, Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984).  Because the statements in Mr. Long's declaration are immaterial, independently established in other parts of the record, or improper for other reasons, the Court will not address the Secretary's sham affidavit argument.

The Secretary also argues that the portions of Mr. Long's declaration that refer to Mr. Vice, the employee who assumed Mr. Long's sandblasting duties after Mr. Long's departure from the Army Depot, are beyond Mr. Long's personal knowledge. (Doc. 24, p. 5). The Court has disregarded those portions of Mr. Long's affidavit because Mr. Gibbons's testimony independently establishes that Mr. Vice replaced Mr. Long. Therefore, that aspect of the Secretary's motion to strike is moot.

Next, the Secretary argues that portions of Mr. Long's declaration improperly state legal conclusions regarding the Army Depot's alleged motivation for Mr. Long's departure. (Doc. 24, pp. 6-7). Paragraphs six and ten of Mr. Long's declaration state in part:

> 6.  . . . . I was laid off because I was black . . . .
>
> . . . .
>
> 10.  Race was a consideration in making the analysis because I am black . . . .

(Doc. 18-1, pp. 29-30). "A party's mere belief and/or speculation is not based on personal knowledge and is not competent summary judgment evidence." *Riley v. Univ. of Ala. Health Servs. Found.*, P.C., 990 F. Supp. 2d 1177, 1187 (N.D. Ala. 2014). Mr. Long's conclusory statements based on his personal beliefs do not constitute direct, circumstantial, or statistical evidence of discriminatory intent. Therefore, those statements have no probative value. The Court strikes from the

summary judgment record Mr. Long's conclusory statements in paragraphs six and ten of his declaration.

The Secretary also challenges the portions of Mr. Long's declaration that state that he had an expectation of renewal and that his renewals were automatic. (Doc. 20, p. 5, n. 3). Paragraph six of Mr. Long's declaration provides in part:

> 6. . . . I had been renewed so many times that I had an expectation of renewal. . . . My renewals were automatic.

(Doc. 18-1, p. 29). Mr. Long provides no facts to support his assertion that renewals of his term of employment with the Depot were automatic. In fact, in his declaration, Mr. Long acknowledged that he "was a term employee. I could be re-newed or not re-newed at the will of the employer." (Doc. 18-1, p. 29). Mr. Long's subjective expectation of automatic renewals is neither relevant nor reasonable in light of his understanding of the terms of his employment. Consequently, the Court strikes from the summary judgment record Mr. Long's statements that he had an expectation of renewal and that his renewals were automatic. *See Griffin v. City of Clanton, Ala.*, 932 F. Supp. 1357, 1358 (M.D. Ala. 1996) ("As a nonmoving party opposing a motion for summary judgment, the Plaintiffs cannot rely on legal conclusions to meet their burden of coming forward with relevant and competent evidence.") (citing *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991)).

The remaining statements that the Secretary challenges in Mr. Long's declaration are immaterial for purposes of summary judgment because they have no bearing on the issues at hand. The Court has disregarded those statements. Thus, the Secretary's motion to strike is moot with respect to those statements.

With these evidentiary rulings in mind, the Court considers the Secretary's motion for summary judgment.

## IV.   MOTION FOR SUMMARY JUDGMENT

A plaintiff can establish a Title VII claim through direct, circumstantial, or statistical evidence of discrimination. *Woods v. Central Fellowship Christian Academy*, 545 Fed. Appx. 939, 944 (11th Cir. 2013). Mr. Long offers no direct or statistical evidence of racial discrimination; instead, he proceeds solely on circumstantial evidence.[3] Thus, the Court analyzes Mr. Long's claim under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under the *McDonnell Douglas* burden-shifting framework, to prove a Title VII race discrimination claim, a plaintiff initially must establish by a preponderance of the evidence a prima facie case of discrimination. *Id.* at 802. A

---

[3] "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998); *see also Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1227 (11th Cir. 2002) ("[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the [basis of the protected classification,] are direct evidence of discrimination.") (internal quotations and citation omitted). Statistical evidence as its name suggests provides mathematical evidence of a pattern of discrimination.

11

plaintiff may satisfy this burden by presenting evidence sufficient to create an inference that an adverse employment action was the product of racial bias. *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977).

If a plaintiff successfully establishes a prima facie case of discrimination, then the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment decision. *See E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002); *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1275 (11th Cir. 2008). The burden at this stage of the analysis is light. If the employer carries its burden of production, then the burden returns to the plaintiff to "put forth evidence sufficient to allow a reasonable fact finder to conclude that the employer's proffered reasons [for the employment action] were pretext." *Paschal v. United Parcel Serv.*, 573 Fed. Appx. 823, 825 (11th Cir. 2014) (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1024-25 (11th Cir. 2000) (en banc)). "Although the intermediate burdens of production shift back and forth, the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the employee remains at all times with the plaintiff." *Joe's Stone Crabs*, 296 F.3d at 1273 (internal citations omitted).

A. **Mr. Long can establish a prima facie case of race discrimination through circumstantial evidence.**

"To establish a prima facie case of discrimination based on disparate treatment in termination, a plaintiff must show that '(1) he is a member of a

protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside his protected class.'" *Winborn v. Supreme Beverage Co., Inc.*, 572 Fed. Appx. 672, 674 (11th Cir. 2014) (quoting *Maynard v. Bd. of Regents,* 342 F.3d 1281, 1289 (11th Cir. 2003)).

The parties do not dispute that Mr. Long is a member of a protected class, that he was qualified for his job, and that he suffered an adverse employment action. The parties dispute whether the Army Depot replaced Mr. Long with someone outside of his protected class. Mr. Long has presented sufficient evidence on this point to survive the Secretary's motion for summary judgment. Mr. Long testified that the Depot replaced him with "white guys." (Doc. 12-4, p. 69). Mr. Gibbons stated that Mr. Vice, a Caucasian employee, replaced Mr. Long after April 30, 2012. (Doc. 12-10, p. 9). Thus, the Court rejects the Secretary's argument that Mr. Long has not provided evidence to establish a prima facie case of race discrimination.

**B.     The Secretary has articulated a legitimate, nondiscriminatory reason for Mr. Long's nonrenewal.**

The Secretary's burden to produce evidence of a legitimate nondiscriminatory reason for Mr. Long's nonrenewal is "exceedingly light." *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997). The proffered reason

13

need only be "one that might motivate a reasonable employer." *Chapman*, 229 F.3d at 1030. "The reason offered by an employer for an action does not have to be a reason that the judge or jurors would act on or approve. . . . Instead all that matters is that the employer advance an explanation that is not discriminatory in nature." *Schoenfield v. Babbitt*, 168 F.3d 1257, 1269 (11th Cir. 2000) (internal quotations and citations omitted).

The Secretary contends that the Army Depot did not renew Mr. Long's term appointment as a sandblaster because the Depot projected an institution-wide decrease in workload for the fiscal year following the expiration of Mr. Long's term of employment. Various Army Depot's managers testified about the fiscal year workload analysis and the number of Depot employees whose terms were not renewed because of the projected decrease in workload. The Court finds that workload decrease is a legitimate basis for the Army Depot's action. *See, e.g.*, *Connor v. Bell Microproducts-Future Tech, Inc.*, 492 Fed. Appx. 963, 967 (11th Cir. 2012) (affirming district court's acceptance of reduction in force and payroll reduction as legitimate, nondiscriminatory reason). Thus, the Secretary has met his burden of stating a legitimate, nondiscriminatory reason for Mr. Long's departure.

**C.     Mr. Long has not presented sufficient evidence to establish that the Army Depot's nondiscriminatory reason for not extending his term of employment was pretext for unlawful discrimination.**

To demonstrate pretext, a plaintiff must show that the employer's explanation for an employment decision was false and that discrimination was the real reason for the employment decision. *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). A plaintiff may satisfy this burden either directly by establishing that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. *Paschal v. Utd. Parcel Serv.*, 573 Fed. Appx. 823, 825 (11th Cir. 2014) (citing *Alvarez v. Royal Alt. Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010)).

To establish indirect evidence of pretext, Mr. Long must show that there are "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Alvarez*, 610 F.3d at 1264 (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker'"

that caused the adverse employment action. *Smith v. Lockheed-Martin*, 644 F.3d 1321, 1328 (11th Cir. 2011) (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011)); *see also Flowers v. Troup Cnty., Ga., Sch. District*, 803 F.3d 1327, 1338-39 (11th Cir. 2015).

Mr. Long argues that the Secretary's reliance on the 2012 fiscal year workload analysis is pretext for racial discrimination because the sandblasting work that was amassing in Mr. Long's cost center when his term ended is inconsistent with the projected downturn in workload, as is the fact that upon the departure of the four sandblasters in Mr. Long's cost center, the Army Depot immediately reassigned four grade 8 mechanics who were Caucasian employees to Mr. Long's cost center to address the sandblasting backlog.

As to the sandblasting work that was "piling up" in Mr. Long's cost center when his term ended, the record demonstrates that the backlog was a short-term deviation from the 2012 workload projection analysis – a deviation that occurred when the term sandblasters in Mr. Long's cost center shirked their responsibilities after learning that the Depot would not renew their terms. (Doc. 12-8, p. 47; Doc. 12-10, p. 16). Mr. Long admits that "[t]here was a backlog of sandblasting work because 3 of the laid off sandblasters stopped working . . . ." (Doc. 17, p. 24). Mr. Gibbons testified that funding gaps also impacted the backlog. (Doc. 12-10, pp. 9-10). Moreover, even if the workload analysis was inaccurate, Mr. Long offered no

evidence that the analysis was contrived as a means to shield the Depot's true discriminatory intent. *See Archie v. Frank Cockrell Body Shop, Inc.*, 581 Fed. Appx. 795, 799 (11th Cir. 2014) ("Showing the employer was mistaken in its beliefs is insufficient.").

The record also demonstrates that the backlog went beyond sandblasting, and the Depot transferred a total of 12 employees to Mr. Long's cost center, five of whom were African-American. (Doc. 12-10, pp. 7-8). While the four grade 8 mechanics assigned to tackle the sandblasting backlog had to be trained to perform sandblasting duties, the Army Depot's strategic choice to non-renew sandblasters and have mechanics perform sandblasting duties rather than renew sandblasters and potentially have too little sandblasting work to occupy them over the course of the fiscal year cannot fairly be called inconsistent or incoherent. Mr. Long has offered no evidence about the types or amount of work that the Depot had for mechanics as compared to the types of work that the four sandblasters in Mr. Long's cost center could do. Mr. Carlisle explained that he had the authority "to move employees from work center to work center as long as they fall within the doctorate of production," and he evaluated "by skill set" the "work within the directorate of production" that had to be accomplished. (Doc. 12-8, p. 27). The Court will not second-guess the way in which the Depot chose to shift skill sets among cost centers. *Chapman*, 229 F.3d at 1030 ("[f]ederal courts 'do not sit as a

super-personnel department that reexamines an entity's business decisions.'") (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)).

Moreover, the record demonstrates Mr. Long and his fellow sandblasters were four of a total of 15 Caucasian and African-American sandblasters whose terms the Depot did not renew because of the workload downturn. (Doc. 12-8, pp. 28, 47). Overall, between March 2012 and June 2012, the Depot chose not to renew the terms of 133 Caucasian and African-American employees. (Doc. 12-16). Thus, at a macro level, the evidence is consistent with the explanation that the Secretary provided for the non-renewals of the sandblasters in Mr. Long's cost center.

The same is true at the micro level. Mr. Long's history of renewals undermines his theory that racial animus was a factor in his non-renewal in 2012. Mr. Long acknowledges that for seven years, the Depot renewed his contract at the end of each term. (Doc. 17, p. 9). Other than the 2012 fiscal year workload projection that forecast a downturn, the record contains no evidence of changes that occurred at the Depot that would have caused Mr. Long's supervisors to suddenly allow his race to influence their term renewal decisions.

Mr. Long offers as circumstantial evidence of discriminatory intent testimony that an employee named "Big Man" directed a racial slur toward him. (Doc. 18-1, ¶ 12). Despite what the name "Big Man" might suggest, nothing in the

record indicates that Big Man had decision-making power at the Depot or was in any way involved in the decision to allow Mr. Long's term to expire. Mr. Long also testified that he heard about a noose hanging in a building at the Depot, and he saw racial slurs written on the bathroom walls. Conduct of this sort is reprehensible and should be eliminated from the workplace, but Mr. Long has not tied evidence regarding this conduct to the supervisors who made the non-renewal decisions in 2012. *See Flowers*, 803 F.3d at 1338 (a plaintiff must present sufficient evidence to "suggest a causal connection between his race and his termination"). The record contains no evidence that suggests that the decision-makers behind Mr. Long's nonrenewal harbored any sort of racial bias or animus toward him or any term employee.

Mr. Long has "produced [no] evidence, outside of his own conclusory say-so, that would support an inference of racial discrimination from the circumstances" presented in this case. *Flowers*, 803 F.3d at 1337. Because the record contains no evidence from which a factfinder reasonably could infer that Mr. Long's race motivated the Army Depot's decision not to renew his appointment as a term sandblaster, Mr. Long's discrimination claim fails as a matter of law. *See Alvarez*, 610 F.3d at 1265 (noting that the issue of pretext "merges with the plaintiff's ultimate burden of persuading the court that the employer intentionally discriminated against" him).

## V.  CONCLUSION

For the reasons discussed above, there is no genuine issue of material fact, and the Secretary is entitled to judgment as a matter of law on Mr. Long's Title VII race discrimination claim.  The Court dismisses with prejudice Mr. Long's claim against the Government.  The Court directs the Clerk to please term Docs. 12 and 20.  The Court will enter a separate final judgment consistent with this memorandum opinion and order.

**DONE** and **ORDERED** this August 17, 2016.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE